Argued and submitted July 13, 1999, reversed and remanded in part; otherwise affirmed February 9, petition for review denied July 25, 2000 (330 Or 412)

## In the Matter of the Marriage of

### Rosalba Vargas GOODE,
*Respondent,*

*and*

### Raymond Ross GOODE,
*Appellant.*

### (C96-0903DR; CA A102769)

997 P2d 244

Wade V. Regier argued the cause for appellant. Gary M. Bullock filed the brief.

John D. Peterson argued the cause and filed the brief for respondent.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

EDMONDS, P. J.

## EDMONDS, P. J.

In this domestic relations case, husband appeals from a judgment of dissolution. ORS 107.105. Husband challenges the trial court's determination that he and wife were married in 1984 as well as the property distribution and spousal support award. We review *de novo*, ORS 19.415(3), and reverse, in part.

In the early 1980's, husband and wife met in Colombia. In early 1984, husband obtained an Oregon divorce from Betty Goode (Betsy), and wife obtained a Dominican Republic divorce from Gabriel Antonio Salamanca Rodriguez (Gabriel).[1] The Dominican Republic judgment states that Gabriel was present in the Dominican Republic and that "all the formalities prescribed by law have been fulfilled." Subsequently, wife and her two sons came to Oregon in May 1984. Husband and wife married in Oregon in November 1984. Thereafter, wife and her two sons returned to Colombia in March 1985 after husband refused to assist her in changing her status with immigration officials based on their marriage. After several years of continued correspondence between the parties, wife and her two sons returned to Oregon in early 1990. In November 1990, wife obtained an Oregon divorce from Gabriel, and, thereafter, she and husband married again in Oregon. Apparently, before the parties' 1990 marriage, they signed a premarital agreement. Husband and wife continued to live together until wife and her sons moved from husband's residence in 1992. Wife purchased her own residence in 1994. However, she and husband continued to spend time together even after wife moved from husband's residence in 1992.

In March 1996, wife filed a petition for the dissolution of the parties' 1984 marriage. Husband filed an answer that included affirmative defenses and counterclaims. In one affirmative defense, husband asserted that his 1984 marriage to wife was void because wife was still married to Gabriel at the time of the 1984 ceremony. The parties stipulated to a bifurcation of the issues at trial. An initial hearing

---

[1] Husband had four children by his marriage to Betsy, and wife had two sons by her marriage to Gabriel.

was held on husband's affirmative defenses and counter-claims. In its order concerning that hearing, the trial court ruled, in part:

"(1)  [Wife's] decree of dissolution of marriage entered March[ ] 1984, in the Dominican Republic between [wife] and [Gabriel] is not subject to collateral attack by [husband] in this suit for dissolution of marriage. Based thereon, the 1984 marriage between [wife] and [husband] in the [S]tate of Oregon and which is the subject of [wife's] suit for disso-lution of marriage as alleged in her petition is a valid Oregon marriage.

"(2)  The court having ruled that the parties' November 19, 1984, marriage is valid, the issues raised as to the valid-ity of the parties' subsequent pre-marital agreement is ren-dered moot."

Based on those rulings, a second hearing was held to deter-mine the issues of property distribution and spousal support. After trial, the trial court entered a judgment that essentially treated all property acquired by the parties between 1984 and 1998 as marital assets. The judgment makes an approx-imately equal division of the property between the parties and awards wife indefinite spousal support of $600 per month.

We begin by addressing husband's assignments of error concerning the issues decided by the trial court at the initial hearing. In husband's first assignment of error on appeal, he argues that the trial court erred in holding that he did not have "standing to challenge the Dominican dissolu-tion" and that the trial court should not have granted comity to the Dominican Republic judgment because neither wife nor Gabriel was present in the Dominican Republic and the public policy of Oregon favors the "restrict[ion of] dissolutions to the jurisdictions of the parties' domicile." Alternatively, husband contends that wife is judicially estopped from asserting the validity of the 1984 divorce judgment because "[a] necessary allegation in [wife's 1990] Oregon dissolution [from Gabriel] was that [w]ife was married to [Gabriel] at the time."

Wife's makes two pertinent counterarguments. She contends that the record is inadequate for review because

husband did not request that the trial court take judicial notice of the Dominican Republic law at issue, nor did the trial court indicate that it was taking judicial notice of that law. Furthermore, she argues that "had [husband] done so, [she] may well have elected to 'prove' the law and legal procedures of both the Dominican Republic and the Republic of Colombia regarding divorce as well as the legal custom of the Republic of Colombia." Specifically, she contends that "[i]t is inappropriate for husband to now be allowed to cite to this court on appeal the law of a foreign jurisdiction to support his arguments when he did not establish in his trial record that he asked for and obtained judicial notice of the law of the foreign jurisdiction." Wife also contends that, if we consider husband's attack on the Dominican Republic divorce, then she is entitled to several statutory presumptions, including the presumption under OEC 311(1)(k) that a court acts within its lawful jurisdiction.

■ ■ Because the validity of the Dominican Republic divorce affects husband's marital status, we agree with him that he can litigate its efficacy.[2] We turn to: (1) whether the Dominican Republic judgment is void for lack of jurisdiction under the law of the Dominican Republic, and (2) whether Oregon will recognize it. An English translation of an authenticated copy of the Dominican Republic judgment that was recorded in Colombia states, in part:

> "IN THE ACTION OF DIVORCE BY MUTUAL CONSENT OF THE SPOUSES GABRIEL ANTONIO SALAMANCA RODRIGUEZ, of legal age, of Colombian nationality, occupation Employee, married, identified with citizenship card No. 19181065 of Bogotá, domiciled in and a resident of Bogotá, Colombia and temporarily in

---

[2] *See* ORS 107.005(1) ("A marriage may be declared void from the beginning for any of the causes specified in ORS 106.020; and, whether so declared or not, shall be deemed and held to be void in any action, suit or proceeding in which it may come into question."); ORS 106.020(1) ("The following marriages are prohibited; and, if solemnized within this state, are absolutely void: * * * [w]hen either party thereto had a wife or husband living at the time of such marriage."); *see also Kiessenbeck v. Kiessenbeck*, 145 Or 82, 26 P2d 58 (1933) (The husband sought to have his marriage to the wife annulled on the ground that she had not obtained a valid divorce judgment at the time that they were married.).

thiscity in house No. 15 on Calle Duarte, Baní, and ROS-ALBA VARGAS DE SALAMANCA, of legal age, of Colombian nationality, occupation Secretary, identified with citizenship card No. 41417776 of Bogotá, domiciled in and a resident of Bogotá, Colombia, and temporarily in this city in house No. 15 on Calle Duarte, whose deputed attorney and special agent is Dr. JOSE RAMON GONZALEZ PEREZ, with open law office in Apartment 201 of the Denisse Building, on Calle Alberto Larancuent No. 7, Ensanche Naco in the city of Santo Domingo and with a choice of domicile at the Secretariat of this Court."

The judgment also states:

"Fourth: For the duration of the divorce proceedings referred to herein the wife shall reside at her present domicile — — Both spouses empower, with the authority to substitute, DR JOSE RAMON GONZALEZ PEREZ, Attorney, bearer of personal identity cedula No. 27679, series 23, valid seal, with open law office at Apartment 201 of the Denisse Building, marked with the number 7 on Calle Alberto Larancuent, Ensanche Naco in the city of Santo Domingo, to represent them in all acts of the mentioned divorce proceeding, both spouses having formally elected said law office as their domicile and gi[v]ing jurisdiction to the Judge of First Instance of the Judicial District of Peravia[.]"

Finally, the judgment indicates "[t]hat in the present case all the formalities prescribed by law have been fulfilled, and therefore it is in order to admit the divorce referred to above."

Wife asserts that, based on the translation of the Dominican Republic judgment, the judgment contains statements that entitle her to a presumption, under Oregon law, that the Dominican Republic court acted with jurisdiction. OEC 311(1)(k) provides that it is presumed that "[a] court, or judge acting as such, whether in this state or any other state or country, was acting in the lawful exercise of the jurisdiction of the court." Also, OEC 308 provides: "In civil actions and proceedings, a presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence." Husband argues that the Dominican Republic court did not have jurisdiction because the evidence shows that the Dominican Republic law requires at least one party to be

present in the country for jurisdiction to exist and that neither wife nor Gabriel was present.

On appeal, wife first contends that husband never asked the trial court to take judicial notice of the law of the Dominican Republic and that the court did not state that it was taking judicial notice of that law; thus, the law of the Dominican Republic is not a part of the record on appeal. We disagree. Husband moved that the trial court take judicial notice of Dominican Republic Law 142 pursuant to OEC 202(6).[3]

The relevant provision of Dominican Republic Law 142, of which husband requested that the trial court take judicial notice, provides:

" 'PARAGRAPH V.— Foreigners who are in the country yet not being residents, will be able to be divorced by Mutual Consent, provided that, at least one of them is (present) in the hearing, and the other represented by one who is granted special power of attorney, they convene in an express manner to attribute competence to a Judge of the First Instance[ ], in the act of conventions and stipulations drawn up by a Notary Public of the same jurisdiction of the tribunal indicated by them. Dispositions of Article 27 of this law will not apply for·the case foreseen (anticipated) in this Paragraph'."

At trial, husband testified that wife told him that she was never in the Dominican Republic; that "she wasn't sure exactly where [Gabriel] lived"; that Gabriel "moved around a lot and was kind of a drifter"; and that wife did not tell him that Gabriel knew of the divorce. Husband also testified that, when he and wife were discussing her divorce from Gabriel, "she replied in a letter, 'Well, how do I know that he is going to give me a divorce?' " Apparently, husband infers from that statement that Gabriel was not in the Dominican Republic at the time of the divorce. Wife testified that she did not recall telling husband: (1) that she did not know where Gabriel was in 1983, and (2) that she did not know whether or not Gabriel knew that they were divorced. Also offered into evidence,

---

[3] By rejecting wife's argument on this basis, we do not necessarily imply agreement with her premise that this court could not otherwise take judicial notice of Dominican Republic law.

without objection, is a letter dated April 11, 1984, from husband to wife to which a letter from husband's immigration attorney is attached. The letter from the attorney states, in part:

> "First, it seems that divorce in the Dominican Republic can either be for cause (e.g. incompat[i]bility of character), or by mutual consent. In a divorce for cause, the divorce must be formally pronounced between 60 and 120 days after the defendant is formally notified of the judgment of divorce, though it is now recognized that the petitioner need not appear in person at the pronouncement. In a divorce by mutual consent, it appears that foreigners to the Dominica[n] Republic can succeed if at least one party personally appears at the divorce hearing, if the other party is represented by proxy. From my conversation with Dr. Valero,[4] it may be that [wife's] ex-husband did personally appear in the Dominican Republic, and that the proper powers of attorney were executed. If this is so, the divorce may well be valid under Dominican law."

Based on our *de novo* review of the record, we are not persuaded that husband carried his burden of proving that the Dominican Republic court acted without jurisdiction. Under Dominican Republic law, one of the parties is required to be present at the hearing. The recitals in the authenticated Dominican Republic judgment assert that the court had jurisdiction under its own law. To the extent that the judgment represents that wife was "temporarily in this city," wife concedes that that recital is inaccurate. In wife's admissions, she also says that she

> "is not aware of whether [Gabriel] was physically present in the Dominican Republic on March 20, 1984, or at any time before or after although [she] does not believe that [Gabriel] was present on the date of the Dominican Republic divorce on March 20, 1984, nor at any time before or after."

---

[4] It is unclear from the record who Dr. Valero is. Based on wife's brief, Valero could be wife's Colombian attorney. Based on the testimony at the initial hearing, he appears to be a Dominican Republic attorney. However, the judgment refers to a Dr. Jose Ramon Gonzalez Perez. The letterhead of a letter included within the translation of the Dominican Republic judgment states "RODOLFO VALERO Y BORRAS" and refers to Colombia, Panama, the Dominican Republic and Florida.

However, the judgment also says that Gabriel was "temporarily in this city." Consequently, it can be inferred that Gabriel was present at the hearing. We are not persuaded that the conflicting evidence on this issue suffices to rebut the presumption under OEC 311(1)(k) when the judgment itself recites that "all the formalities prescribed by law have been fulfilled." We presume that the judicial record speaks the truth when signed by the court and, apparently, the clerk of the court. Consequently, we hold that, insofar as can be discerned from the record before us, the Dominican Republic court rendered the judgment with jurisdiction in accordance with its own law.

■　　　The next issue is whether we should recognize the Dominican Republic judgment as a matter of comity. In *Red Fox and Red Fox*, 23 Or App 393, 398-99, 542 P2d 918 (1975), *rev den* (1976), we stated:

> "A rule of general application is that a judgment entered by a court of a foreign nation is entitled to recognition to the same extent and with as broad a scope as it has by law or usage in the courts of the jurisdiction where rendered, *if*: (1) the foreign court actually had jurisdiction over both the subject matter and the parties; (2) the decree was not obtained fraudulently; (3) the decree was rendered under a system of law reasonably assuring the requisites of an impartial administration of justice—due notice and a hearing; and (4) the judgment did not contravene the public policy of the jurisdiction in which it is relied upon." (Emphasis in original.)

In formulating our rule, we relied on *Hilton v. Guyot*, 159 US 113, 205-06, 16 S Ct 139, 40 L Ed 95 (1895), in which the Court stated:

> "When * * * [a] foreign judgment appears to have been rendered by a competent court, having jurisdiction of the cause and of the parties, and upon due allegations and proofs, and opportunity to defend against them, and its proceedings are according to the course of a civilized jurisprudence, and are stated in a clear and formal record, the judgment is *prima facie* evidence, at least, of the truth of the matter adjudged; and it should be held conclusive upon the merits tried in the foreign court, unless some special

ground is shown for impeaching the judgment, as by show-
ing that it was affected by fraud or prejudice * * *."

Husband's arguments concerning comity reduce to
whether a dissolution judgment obtained by Colombian citi-
zens in another foreign nation violates the public policy of
Oregon when that foreign nation requires that one party to
the dissolution be present at the proceeding but does not
require that either party be domiciled there. Specifically,
husband argues:

> "A judgment will not be granted comity if it frustrates
> public policy. *Red Fox*, 23 Or App at 399. Oregon's policy of
> discouraging forum shopping by requiring that jurisdiction
> for dissolution requires domicile of at least one of the
> spouses in the forum, ORS 107.075, *Kelley v. Kelley*, 183 Or
> 169, 183, 191 P2d 656 (1948), would be undermined by the
> granting of comity in this case."

ORS 107.075 provides:

> "(1)   If the marriage was solemnized in this state and
> either party is a resident of or domiciled in the state at the
> time the suit is commenced, a suit for its annulment or dis-
> solution may be maintained where the ground alleged is
> one set forth in ORS 106.020 or 107.015.

> "(2)   When the marriage was not solemnized in this
> state or when any ground other than set forth in ORS
> 106.020 or 107.015 is alleged, at least one party must be a
> resident of or be domiciled in this state at the time the suit
> is commenced and continuously for a period of six months
> prior thereto.

> "(3)   In a suit for separation, one of the parties must be
> a resident of or domiciled in this state at the time the suit is
> commenced.

> "(4)   Residence or domicile under subsection (2) or (3) of
> this section is sufficient to give the court jurisdiction with-
> out regard to the place where the marriage was solemnized
> or where the cause of suit arose."

It is significant to our analysis that, at the time of
the Dominican Republic divorce, wife was a Colombian citi-
zen and obtained the Dominican Republic judgment in
March 1984 when she was domiciled in and a resident of
Colombia. She did not come to the United States until May

1984. Any public policy of the State of Oregon to prevent forum shopping could not have been violated under those circumstances, as it might have been had wife been an Oregon resident at the time that she obtained the divorce. In contrast, the parties in *Kelley* were married in Washington and were domiciled in Oregon. The husband deserted the wife, and, thereafter, she petitioned for an order of support. An Oregon circuit court entered a decree awarding support. Several years later the husband went to Nevada and obtained a dissolution judgment. Immediately after its entry, he returned to Oregon. The wife then instituted a suit for desertion in an Oregon court. The husband appealed after the Oregon court "adjudged that a decree of divorce granted the [husband] from the [wife] in the state of Nevada was void" and awarded the wife a separation from bed and board as well as monthly support. *Kelley*, 183 Or at 171. On appeal, the Supreme Court held that the trial court ruled properly in declaring the Nevada divorce judgment void and that "Article IV, Section I, [of the] United States Constitution, does not preclude the courts of this state from impeaching the Nevada decree upon becoming satisfied that the [husband] had not established a domicile in Nevada." *Id.* at 183.

To the extent that ORS 107.075 and *Kelley* reflect a public policy to prevent forum shopping, that policy is not offended under the circumstances of this case. Unlike in *Kelley*, a case involving an Oregonian attempting to obtain a divorce in a forum in which he was not domiciled, here, wife obtained the Dominican Republic judgment, before coming to the United States, when she was domiciled in and a resident of Colombia. Thus, we hold that the Dominican Republic judgment should be afforded comity.

■     As an alternative argument, husband asserts that wife should be judicially estopped from "asserting the validity of the Dominican dissolution and the 1984 marriage" because "[a] necessary allegation in [her 1990] Oregon dissolution [from Gabriel] was that [w]ife was married to [Gabriel] at the time. That clearly contradicts her current allegations[ ] that the Dominican dissolution terminated her first marriage in 1984 and her marriage to [h]usband dates from 1984." The Supreme Court has stated that "[j]udicial estoppel is a common law equitable principle * * * [t]he purpose [of which] is 'to

protect the judiciary, as an institution, from the perversion of judicial machinery.'" *Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 609, 892 P2d 683 (1995) (quoting *Edwards v. Aetna Life Ins. Co.*, 690 F2d 595, 599 (6th Cir 1982)). In this case, the purpose of judicial estoppel would not be furthered by application of the principle. Wife does not seek to defraud an Oregon court or otherwise pervert justice by her reliance on the Dominican judgment. Rather she seeks to avoid what otherwise would be a bigamous relationship with husband. Furthermore, estoppel is an equitable doctrine. It would be unfair to wife to apply it as a bar when husband promoted and encouraged the Dominican divorce. After considering all of the parties' arguments, we conclude that the Dominican divorce should be recognized and that the parties were lawfully married in 1984.

In his second assignment of error, husband contends that the trial court erred in denying effect to a premarital agreement that was executed after the parties' 1984 marriage but before their second ceremony in November 1990. Because of our disposition of husband's first assignment of error, husband's argument cannot prevail. *See* ORS 108.700(1) (A premarital agreement is "an agreement between prospective spouses made in contemplation of marriage and to be effective upon marriage."). Even if the agreement is part of the record before us, it does not have the legal character of a premarital agreement.[5]

■       In husband's third assignment of error, he challenges the trial court's property distribution. Specifically, he argues:

"Because the premarital agreement was valid, the parties' property should be divided pursuant to its terms, according to which, substantially more property should be awarded to [h]usband, [w]ife should not receive support, and neither party should receive attorney fees. In the alternative, the marriage was effectively short term, as a result of the parties' separations from 1985 to 1989 and after

_____

[5] It is questionable whether the agreement is part of the evidentiary record. The agreement was discussed during the testimony but we are unable to find in the transcript where it was admitted into evidence. The transcript index indicates that it was not offered or received, but the exhibit record indicates to the contrary.

1992, and [h]usband has rebutted the presumption of equal contribution for the periods of separation. The trial court improperly applied long-term marriage standards in dividing the property."

Our *de novo* review of the record reveals that the trial court's property distribution is just and proper under the circumstances of this case. ORS 107.105(1)(f). Although there were periods of time during which the parties did not cohabit, there is also a consistent thread in the evidence that, during those times, the parties repeatedly attempted to reconcile and in other ways acted as a married couple. Without detailing the circumstances, which would not benefit the bench or bar, we are not persuaded by the evidence that the presumption of equal contribution under ORS 107.105(1)(f) was rebutted during the periods of separation.

■    Husband's final assignment of error challenges the trial court's award of $600 per month in indefinite spousal support. Husband contends that the award was excessive. Specifically, husband argues:

> "The parties cohabitated for a total of no more than three years, from 1984 to 1985 and 1990 to 1992. For most of the remainder of the marriage, they were financially independent or substantially independent. Under the circumstances, it is not necessary to grant indefinite spousal support, nor is it necessary to set the award at $600.00 per month after the first year. At most, a three year award, beginning at $600.00 per month and decreasing to $400.00 per month after the first year, is appropriate."

Wife's counterarguments reduce to three points: (1) the parties have been married since 1984; (2) although wife works full time and performed homemaker functions, husband's income is more than twice that of hers; and (3) because the support award covers the disparity between her income and expenses, it serves only to assure that she enjoys a standard of living that is not overly disproportionate to that enjoyed during the marriage. Concerning her current standard of living wife testified: "I don't have money for extra things. I don't have money for vacations. And I have more debts."

In *Harris and Harris,* 142 Or App 427, 430, 921 P2d 1329 (1996), we stated:

"In setting the amount and duration of support, we attempt to determine 'such amount of money for such period of time as it may be just and equitable' for husband to pay. ORS 107.105(1)(d).[6] We do not attempt merely to eliminate disparities in the parties' incomes or to enable one spouse to look to the other indefinitely for support."

[6] ORS 107.105 provides, in part:

"(1) Whenever the court grants a decree of marital annulment, dissolution or separation, it has power further to decree as follows:

"* * * * *

"(d) For the support of a party, such amount of money for such period of time as it may be just and equitable for the other party to contribute, such contribution to be in gross, in installments or both, as the court may order. The court may approve, ratify and decree voluntary agreements providing for contribution to the support of a party. In making such support order, the court shall consider the following:

"(A) The length of the marriage;

"(B) The age and the physical and mental health of the parties;

"(C) The contribution by one spouse to the education, training and earning power of the other spouse;

"(D) The earning capacity of each party, including educational background, training, employment skills and work experience;

"(E) The need for education, training or retraining to enable a party to become employable at suitable work or to enable the party to pursue career objectives to become self-supporting at a standard of living not overly disproportionate to that enjoyed during the marriage to the extent that is possible;

"(F) The extent to which the present and future earning capacity of a party is impaired due to the party's extended absence from the job market to perform the role of homemaker, the extent to which suitable job opportunities are unavailable to a party considering the age of the party and the length of time reasonably anticipated for a party to obtain training or updating of career or job skills. * * *;

"(G) The number, ages, health and conditions of dependents of the parties or either of them and provisions of the decree relating to custody of the children, including the length of time child support obligations will be in effect;

"(H) The tax liabilities or benefits to each party and the net spendable income available to each party after accounting for such liabilities and benefits * * *;

"(I) The amount of long-term financial obligation, including legal fees and costs;

"(J) Costs of health care to a party;

"(K) The standard of living established during the marriage;

"(L) Premiums paid or to be paid for life insurance under ORS 107.810 to 107.830 on the life of a party ordered to pay support; and

"(M) Such other matters as the court shall deem relevant in the particular case in order that each party shall have the opportunity to achieve an economic standard of living not overly disproportionate to that enjoyed during the marriage, to the extent that is possible."

In this case, there is no persuasive evidence that wife has suffered any permanent decrease in her income-earning ability as the result of the marriage. Thus, any spousal support should have the goal of ending any temporary support-dependency relationship between the parties to the extent that that can be accomplished without undue hardship or injustice.

Here, at the time that the judgment was entered, husband was a 58-year-old engineer with a monthly gross income of approximately $6,010. Wife was 50 years old at the time the judgment was entered. She was employed in Colombia when she and husband met and when she lived in Colombia between 1985 and 1990. Since 1991, she has been employed as a secretary with the Clackamas Education Service District, and she has also worked as an interpreter for a public health office since 1993. Her monthly gross income is approximately $2,491. She also has insurance coverage through her employer. In light of wife's employment before and throughout the marriage and the considerable property awarded to her by the judgment, an award of spousal support is not warranted. As a result of those resources, she will be able to enjoy a standard of living not overly disproportionate to that enjoyed during the marriage. None of the parties' other arguments merits discussion.

Spousal support award reversed and otherwise remanded for entry of judgment terminating pendente lite spousal support as of the date of this opinion; otherwise affirmed.