Argued and submitted September 19, 2001, reversed and remanded in part;
otherwise affirmed January 30, 2002

Kosuke KOTERA;
Sho International Corp.,
an Oregon corporation;
and World Link's Corp.,
an Oregon corporation,
*Appellants,*

*v.*

DAIOH INTERNATIONAL U.S.A. CORP.,
an Oregon corporation;
Shigeru Nakai;
and Yukiyoshi Majima,
*Respondents,*

*and*

EBISU JUTAKU CO., LTD.,
a Japanese corporation,
and Matashirou Yasufuku,
*Respondents,*

*and*

DAIOH SHOJI CO., LTD.,
a Japanese corporation;
the Estate of Tadamasa Ohno;
and Tomo Sekiguchi,
*Defendants.*

9509-06556; A100452

40 P3d 506

R. Daniel Lindahl argued the cause for appellants. With him on the briefs were Stephen F. English, Robert B. Lowry, and Bullivant Houser Bailey, P.C.

Lynn R. Nakamoto argued the cause for respondents Ebisu Jutaku Co., Ltd. and Matashirou Yasufuku. With her on the briefs were Peter H. Glade and Markowitz, Herbold, Glade & Mehlhaf, P.C.

No appearance for respondents Daioh International U.S.A. Corp., Shigeru Nakai and Yukiyoshi Majima.

Before Landau, Presiding Judge, and Brewer and Schuman, Judges.

BREWER, J.

**BREWER, J.**

This appeal arises from an action against eight defendants in which plaintiff asserted 18 claims of tortious misconduct arising out of three international business transactions. As relevant to this appeal, plaintiff alleged claims for fraudulent transfer of a trust deed, violation of the Oregon Racketeer Influenced and Corrupt Organizations Act (ORICO), ORS 166.715 through ORS 166.735 (1993),[1] and various acts of misconduct associated with a real estate transaction in Japan. Because of the complex nature of the action, we introduce the parties and relevant claims and then explore the factual background in detail before turning to the legal issues.

We begin with the parties. Plaintiff Kosuke Kotera is a Japanese citizen who resides in Japan. Plaintiffs Sho International Corp. and World Link's Corp. are Oregon corporations controlled by Kotera and his father.[2] Tadamasa Ohno was president and managing director of defendant Daioh Shoji (Daioh Japan), a Japanese company; Ohno died in November 1993, and his estate is named as a defendant in this action. Defendant Matashirou Yasufuku is Ohno's father-in-law. Defendant Yukiyoshi Majima is an employee of Daioh Japan. Defendant Daioh International, USA (Daioh Oregon), is an Oregon corporation that is a subsidiary of Daioh Japan. Defendants Shigeru Nakai and Tomo Sekiguchi are employees of Daioh Oregon. Defendant Ebisu Jutaku Co., Ltd. (Ebisu), is a Japanese company controlled by Ohno's father. The two Japanese companies—Daioh Japan and Ebisu—are interconnected in a number of respects. For example, business cards distributed by Ohno's father and other Ebisu employees listed both companies, and Daioh Japan's corporate informational materials identified Ebisu as an affiliated company. In addition, Ohno served as a

---

[1] The Oregon Legislature amended ORICO in 1995. The parties do not assert that the amendments are applicable to this action. Accordingly, all references to ORICO are to the 1993 version of the statutes.

[2] Kotera's father is not a party to this action. We refer to Kotera and the corporations collectively as plaintiff.

member of the board of directors of Ebisu, his father's company, and his father performed a reciprocal role on the board of Daioh Japan, Ohno's company.

Plaintiff appeals from a summary judgment and a directed verdict in favor of Yasufuku that, in combination, fully disposed of plaintiff's fraudulent transfer claim against him.[3] Plaintiff also appeals from directed verdicts in favor of defendants Ebisu, Daioh Oregon, Majima, and Nakai on claims related to a transaction involving a building in Japan and claims under ORICO.[4] Yasufuku and Ebisu cross-assign error to the denial of their pretrial motions to dismiss all claims against them for lack of personal jurisdiction. We conclude that the trial court erred in asserting personal jurisdiction over Yasufuku and Ebisu and in dismissing ORICO claims against Daioh Oregon, Nakai, and Majima; otherwise, we affirm.

We state the evidence adduced at trial in the light most favorable to plaintiff. *Paulson v. Western Life Insurance Co.*, 292 Or 38, 40 n 1, 636 P2d 935 (1981).[5] Plaintiff became acquainted with Ohno socially in Japan in the late 1980s, and they discussed the possibility of business ventures in the United States and Japan. Ohno later suggested that plaintiff invest in Oregon real estate. In 1990, Ohno advised plaintiff to purchase a Portland office building (the Durham & Bates building). Ohno advised plaintiff that the sellers would artificially inflate the price of the building if the sellers knew that the buyer was a Japanese citizen. Accordingly, Ohno advised

---

[3] The summary judgment was based on the ground that a portion of the fraudulent transfer claim was barred by the applicable statute of limitations. The directed verdict on the balance of the fraudulent transfer claim was based on the purported insufficiency of the evidence at trial.

[4] Plaintiff obtained a default judgment on his claims against Ohno's estate and an ORCP 67 B judgment on his claims against Daioh Japan; neither of those defendants appeal. In addition, during the pendency of this appeal, plaintiff and Sekiguchi reached a settlement disposing of a money judgment against Sekiguchi; accordingly, we omit discussion of the claims against Sekiguchi.

[5] Because we conclude that the trial court erred in denying Yasufuku's and Ebisu's pretrial motions to dismiss plaintiff's claims against them for lack of personal jurisdiction, we consider separately the evidence presented in connection with those motions. Although overlapping to some extent, the evidence received at trial was, of course, not identical to the more limited evidence submitted in connection with those motions. Also, because of our disposition, we do not consider the evidentiary record on Yasufuku's summary judgment motion.

plaintiff that the best way to structure the transaction would be for Daioh Oregon to purchase the building, then sell it immediately to plaintiff. On Ohno's advice, plaintiff engaged the Daioh companies as his agents in the transaction, for which plaintiff would pay approximately $69,000. Majima and Nakai showed the building to plaintiff. Majima told plaintiff that the building's asking price was $2 million but that Daioh Oregon could purchase it for $1.85 million. In reality, Daioh Oregon could—and did—purchase the building from the seller for $1.525 million. Daioh Oregon then immediately resold the building to plaintiff for $1.85 million, realizing $325,000 in profit. The closing of the sale to plaintiff was conducted entirely in English, despite plaintiff's limited understanding of English. Sekiguchi served as plaintiff's translator. Although Majima, Nakai, and Sekiguchi were aware of the price discrepancy, all failed to disclose it to plaintiff.

The second transaction occurred in 1991. The Daioh companies were in the process of developing the Oregon Golf Club in West Linn, Oregon, and the project had run into financial difficulties. Ohno privately approached plaintiff with a proposal: plaintiff would transfer $8 million to Ebisu in exchange for an interest in a building in Akashi City, Japan (the Akashi building), that was owned by Ebisu and managed by Daioh Japan. The Akashi building was a "snack building," which is a combination bar and brothel. Plaintiff was reluctant to make the deal because, he said, the building is "high-risk, and it has sort of a dangerous image." Ohno assured plaintiff that, although the transaction would be structured as a sale, the $8 million in actuality would be a loan, partially secured by the building, to complete the development of the Oregon Golf Club. Ohno advised plaintiff to obtain the money by selling two pieces of real property that plaintiff owned in Japan and arranged for a bank to lend plaintiff the remainder. Plaintiff followed Ohno's advice and agreed to the transaction.

The third transaction occurred in 1992. Again at Ohno's suggestion, plaintiff engaged Daioh Oregon as his agent in the purchase of 10 condominiums in Bellevue, Washington (the Ridge Condos). As in the purchase of the Durham & Bates building, Daioh employees misrepresented

to plaintiff the asking price and the seller's best price for the condominiums. Daioh purchased the condominiums for $900,000 and immediately resold them to plaintiff for just over $1.1 million.

The Oregon Golf Club project continued to founder, and by 1993, Daioh Oregon owed approximately $33 million to Daioh Japan. Unfavorable movements in the dollar-to-yen exchange rate caused Daioh Oregon to suffer losses when it made payments on that debt, and tax laws prohibited Daioh Oregon from deducting losses on payments made directly to its parent company. To avoid the effect of those laws, the Daioh companies restructured the debt to involve Yasufuku. To effectuate the restructuring, Daioh Oregon gave a $33 million promissory note to Yasufuku, secured by interests in various properties not including the Oregon Golf Club. In turn, Yasufuku executed a $33 million promissory note in favor of Daioh Japan. The result of this arrangement was that Daioh Oregon's loan payments flowed through Yasufuku to Daioh Japan while avoiding adverse tax consequences for Daioh Oregon.

Ohno died in November 1993, shortly after the debt restructuring, and his wife assumed control of the Daioh companies. Daioh Oregon continued to suffer financial losses, and, in August 1994, Ohno's wife gave Yasufuku a trust deed for the Oregon Golf Club property to avoid its potential sacrifice to other creditors.

Ebisu also was suffering financially, in part because the Akashi building was not profitable. Although their written purchase contract had called for Ebisu to make payments to plaintiff for six months if the building did not produce adequate gross income, plaintiff actually received monthly payments for more than two years—most from Ebisu, and some from Daioh Japan. In September 1994, Daioh Japan went into liquidation proceedings in Japan. Majima asked plaintiff to consent to a reduction in the monthly payments—which he did—but the payments stopped entirely after December 1994. Ultimately, the Oregon Golf Club was sold, leaving Daioh Oregon with no assets. Because he held the trust deed, Yasufuku received $8 million from the sale.

In the wake of the foregoing events, plaintiff filed this action alleging 18 claims against the various defendants.[6] Ebisu and Yasufuku moved to dismiss the claims against them based on lack of personal jurisdiction, the existence of another action pending between the same parties for the same cause, and inconvenient forum.[7] The trial court denied the motion on all grounds.

At trial, upon completion of plaintiff's case-in-chief, Daioh Oregon, Majima, and Nakai moved for a directed verdict on all claims relating to the Akashi building.[8] Their attorney argued:

"[One] issue on jurisdiction that I want to ask the court to consider is the doctrine of comity. * * * I think that this is a tailor-made case where it's appropriate * * * to say it does not make sense for an Oregon [court] to be involved in a case that involves the following.

"First, it involves a property that is in Japan; second, it involves a transaction where the evidence is that all of the negotiations took place in Japan, all of the documents are in Japanese, [and] the rights of the parties relating to the transaction would seem to be subject to Japanese law.

---

[6] Plaintiff's first amended complaint numbered the claims 1 through 17, but two claims were described as the sixth claim. The parties and the court denominated those claims as claims number 6(1) and 6(2).

The claims and defendants relevant to this appeal are, in the order presented in plaintiff's complaint, as follows: (1) ORICO violations, against all defendants but Yasufuku; (6)(2) breach of contract regarding the loan for the Akashi building, against Daioh Oregon, Ebisu, and Majima; (7) fraud regarding the loan for the Akashi building, against Daioh Oregon, Ebisu, and Majima; (8) fraudulent transfer of a trust deed under the Uniform Fraudulent Transfer Act, ORS 95.200 through ORS 95.310, against Yasufuku; (9) breach of agency duties regarding the loan for the Akashi building, against Daioh Oregon and Majima; (10) breach of fiduciary duty regarding the loan for the Akashi building, against Daioh Oregon and Majima; and (12) civil conspiracy and aiding and abetting regarding the loan for the Akashi building, against Daioh Oregon, Ebisu, and Majima.

[7] *Novich v. McClean*, 172 Or App 241, 244 n 1, 18 P3d 424, *rev den* 332 Or 137 (2001), held that

"[t]he inconvenient forum doctrine is most commonly referred to by its Latin name of *forum non conveniens*. We will refer to it in this opinion as the inconvenient forum doctrine."

[8] Again, the claims relating to the Akashi building were: breach of contract (claim 6(2)); fraud (claim 7); breach of agency duties (claim 9); breach of fiduciary duty (claim 10); and conspiracy and aiding and abetting (claim 12).

"And based on that, it appears that every factual and legal issue involved with regard to this Akashi transaction is centered in Japan and has nothing to do with the state of Oregon. * * *

"* * * * *

"* * * [E]ven if there is personal jurisdiction over some of the defendants in this case who may have had something to do with the Akashi building transaction, I don't think that makes it appropriate for this court to exercise its jurisdiction."

In addition, Majima and Daioh Oregon moved for a directed verdict on plaintiff's ORICO claim, arguing that plaintiff had failed to establish predicate acts, a pattern of conduct, the existence of an enterprise, and each defendant's individual role in managing the enterprise. The trial court granted the motions. At the close of trial, the jury returned a verdict in favor of plaintiff on the remaining claims. For breach of fiduciary duty and fraud, the jury awarded plaintiff damages in the amount of $428,292 against Daioh Oregon, Sekiguchi, and Majima in regard to the Durham & Bates building transaction and $237,958 in damages against Daioh Oregon, Nakai, and Majima in regard to the Ridge Condo transaction. The money judgment for those sums included prejudgment interest. The jury also awarded punitive damages of $700,000 against Daioh Oregon, $250,000 against Majima, $100,000 against Nakai, and $55,000 against Sekiguchi.

■ On appeal, plaintiff first assigns error to the trial court's granting of summary judgment and, at trial, a directed verdict in favor of defendant Yasufuku, which had the combined effect of disposing of all specifications of plaintiff's eighth claim, the fraudulent transfer claim against Yasufuku. Yasufuku cross-assigns error to the trial court's denial of his motion to dismiss for lack of personal jurisdiction, ORCP 21 A(2), the existence of another action pending under ORCP 21 A(3),[9] and inconvenient forum. Because a

_____

[9] ORCP 21 A provides, in part:

"[T]he following defenses may at the option of the pleader be made by motion to dismiss: (1) lack of jurisdiction over the subject matter, (2) lack of jurisdiction over the person, (3) that there is another action pending between the same

judgment is void if the trial court lacks either subject matter or personal jurisdiction, *Hermens v. Veal*, 117 Or App 316, 319, 843 P2d 1013 (1992), we begin with Yasufuku's personal-jurisdiction argument.

 In reviewing the denial of a motion to dismiss for lack of personal jurisdiction, we assume the truth of all well-pleaded allegations. *Sutherland v. Brennan*, 131 Or App 25, 28, 883 P2d 1318 (1994), *aff'd on other grounds* 321 Or 520, 901 P2d 240 (1995) (describing the identical assumption in context of the *granting* of a motion to dismiss for lack of personal jurisdiction). Plaintiffs have the burden of alleging and proving facts sufficient to establish personal jurisdiction. *Portland Trailer & Equipment v. A-1 Freeman Moving*, 166 Or App 651, 654, 5 P3d 604 (2000). We construe pleadings and affidavits liberally to support jurisdiction. *Id*. Once the jurisdictional facts are established, we review the determination of personal jurisdiction for errors of law. *Id*.

Plaintiff's first amended complaint alleged only one claim against Yasufuku. As pertinent here, that claim alleged:

"101.

"On August 31, 1994, Daioh [Oregon] executed a Deed of Trust as Grantor in favor of Yasufuku as beneficiary. Said Deed of Trust encumbered certain property known as the Oregon Golf Club and related building lots ('The Oregon Golf Club'), all as described more particularly in the trust deed. The trust deed was recorded on September 2, 1994. The trust deed purports to secure a promissory note in the principle amount of $33,435,401 dated September 27, 1993. The note was executed by Ohno, then President of Daioh [Oregon], while on his deathbed. The trust deed was granted by Daioh [Oregon] approximately one month before its parent company, Daioh [Japan], filed for the special liquidation in Japan.

---

parties for the same cause, (4) that plaintiff has not the legal capacity to sue, (5) insufficiency of summons or process or insufficiency of service of summons or process, (6) that the party asserting the claim is not the real party in interest, (7) failure to join a party under Rule 29, (8) failure to state ultimate facts sufficient to constitute a claim, and (9) that the pleading shows that the action has not been commenced within the time limited by statute."

"102.

"At the time the trust deed was given ('the transfer'), Yasufuku was an insider in relation to Daioh [Oregon] in that he was the father-in-law of Ohno, its then president, and the father of Mrs. Ohno, the sole director.

"103.

"At the time of the transfer, [plaintiff was a] creditor of Daioh [Oregon].

"104.

"The transfer was made with actual intent to hinder, delay and defraud creditors of the debtor, including [plaintiff].

"105.

"The transfer was not made for present value.

"106.

"Daioh [Oregon] was insolvent when the transfer was made, and Yasufuku had reasonable cause to believe Daioh [Oregon] was then insolvent.

"107.

"Daioh [Oregon] did not receive a reasonably equivalent value in exchange for the transfer.

"108.

"[Plaintiff is] entitled to a judgment avoiding the transfer to the extent necessary to satisfy [his] claims; an injunction against Daioh [Oregon] and Yasufuku against disposition of any proceeds from the sale of the Oregon Golf Club; for a prejudgment attachment of such proceeds to the extent necessary to satisfy any judgments granted to [plaintiff] against Daioh [Oregon] or Yasufuku."

Personal jurisdiction over an out-of-state defendant may be "general," ORCP 4 A, "specific," ORCP 4 B through K, or conferred under the "catchall" due process provision, ORCP 4 L. *State ex rel Circus Circus Reno, Inc. v. Pope*, 317 Or 151, 154-56, 854 P2d 461 (1993). Plaintiff relies on *Portland Trailer* for the proposition that "a single contact

with the forum state that is 'substantively relevant' to the claim may suffice" to authorize general personal jurisdiction over a defendant. 166 Or App at 657. Plaintiff's reliance is misplaced; *Portland Trailer* discussed only *specific* personal jurisdiction. In any event, ORCP 4 provides for general jurisdiction only against a defendant who, when the action is commenced:

"A(1) Is a natural person present within this state when served; or

"A(2) Is a natural person domiciled within this state; or

"A(3) Is a corporation created by or under the laws of this state; or

"A(4) Is engaged in substantial and not isolated activities within this state, whether such activities are wholly interstate, intrastate, or otherwise; or

"A(5) Has expressly consented to the exercise of personal jurisdiction over such defendant."

Plaintiff does not contend that Yasufuku was served while in Oregon, is domiciled in Oregon, is an Oregon corporation, or has consented to personal jurisdiction. Therefore, ORCP 4 A(4) is the only subsection even potentially applicable to Yasufuku. Plaintiff contends that Yasufuku committed one act in Oregon—the filing of the trust deed encumbering the Oregon Golf Course. By its terms, ORCP 4 A does not confer personal jurisdiction on the basis of an isolated activity. It is evident that a single act is an isolated activity. Therefore, ORCP 4 A does not confer general personal jurisdiction over Yasufuku.

■ Plaintiff next argues that he established specific jurisdiction under ORCP 4 C and D. ORCP 4 C provides that personal jurisdiction lies "[i]n any action claiming injury to person or property within or without this state arising out of an act or omission within this state by the defendant." Again, plaintiff contends that Yasufuku's act was the recording of the trust deed, which occurred in Oregon. Yasufuku responds that "[t]he transfer as it relates to Yasufuku was Yasufuku's receipt of the trust deed or of any funds. * * * [T]herefore the relevant act by him was committed in Japan." However, regardless of which conduct is relevant, plaintiff failed to

allege any injury to his person or property. *See Portland Trailer*, 166 Or App at 655 (holding that economic loss is not personal injury or injury to property under ORCP 4 C and D). In particular, the Oregon Golf Club represents the only property in Oregon mentioned in the claim, and plaintiff did not allege that it was injured in any way. Accordingly, neither ORCP 4 C nor D confers personal jurisdiction over Yasufuku.

■ Because neither of the specific provisions of ORCP 4 cited by plaintiff confers jurisdiction, we turn to ORCP 4 L— the "catchall" provision. ORCP 4 L provides for personal jurisdiction over a defendant "in any action where prosecution of the action against a defendant in this state is not inconsistent with the Constitution of this state or the Constitution of the United States." Determining whether the trial court had personal jurisdiction over Yasufuku pursuant to ORCP 4 L requires applying principles established by decisions of the United States Supreme Court regarding the constitutionality of exercising jurisdiction under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Circus Circus*, 317 Or at 156. The exercise of jurisdiction over a nonresident defendant is consistent with due process, and thus constitutional, if the defendant has "minimum contacts" with the forum state, *Burger King Corp. v. Rudzewicz*, 471 US 462, 474, 105 S Ct 2174, 85 L Ed 2d 528 (1985), and the assertion of jurisdiction would comport with notions of fair play and substantial justice, *Asahi Metal Industry Co. v. Superior Court of California,* 480 US 102, 113-14, 107 S Ct 1026, 94 L Ed 2d 92 (1987). *See also Portland Trailer*, 166 Or App at 656.

■ Minimum contacts are satisfied "if the defendant has purposefully directed its activities at residents of the forum state and where the litigation arises out of or relates to those activities." *Circus Circus*, 317 Or at 159 (quoting *Burger King,* 471 US at 472) (quotations marks, emphasis omitted). Again, plaintiff points to a single action by Yasufuku that was directed at Oregon: the filing of the trust deed in Clackamas County.[10] In filing the trust deed, Yasufuku purposefully directed an action toward Oregon that permitted him to obtain statutory priority over Daioh Oregon's

---

[10] Plaintiff's fraudulent transfer claim also alleges two facts related to Yasufuku: Yasufuku was an insider, and he had reasonable cause to believe Daioh Oregon was insolvent at the time of the transfer. The first fact is an allegation of

unsecured creditors. Plaintiff contends that he is one of those creditors. Thus, his claim for fraudulent transfer arises out of and relates to Yasufuku's act. Minimum contacts are established.

█ The question remains whether exercising jurisdiction over Yasufuku would be reasonable. *See Circus Circus*, 317 Or at 159-60. Plaintiff relies on *State ex rel Sweere v. Crookham*, 289 Or 3, 609 P2d 361 (1980), *State ex rel Ware v. Hieber*, 267 Or 124, 515 P2d 721 (1973), and *Boehm & Co. v. Environmental Concepts, Inc.*, 125 Or App 249, 865 P2d 413 (1993), for the proposition that the execution of a guaranty to an Oregon corporation, combined with evidence that the guaranty played an integral part in causing or promoting significant economic consequences in Oregon, suffices to establish the reasonableness of an exercise of personal jurisdiction. Plaintiff's reliance is misplaced. Each case was an action to recover on a guaranty the execution of which *itself served as the minimum contact* for purposes of personal jurisdiction. By contrast, Yasufuku's equivalent obligation in this case—the promissory note to Daioh Japan—was undertaken in Japan and is not an Oregon contact at all. The same is true of Daioh Oregon's promissory note to Yasufuku, made to document the restructuring of Daioh Oregon's preexisting indebtedness to Daioh Japan. Neither of those transactions, taken alone or together, supports the assertion of personal jurisdiction over Yasufuku in Oregon. *See State ex rel Michelin v. Wells*, 294 Or 296, 302, 657 P2d 207 (1982) ("If a fact is irrelevant [to a claim] in a purely domestic dispute, it does not become related to the controversy simply because there are multistate elements.") (quotation marks, citation omitted).

The proper analysis of reasonableness in a personal jurisdiction analysis is illustrated by *Asahi Metal*. In that case, a Taiwanese corporation, Cheng Shin, sought indemnity from a Japanese corporation, Asahi, for product liability arising out of a motorcycle tire malfunction that caused a death on a California highway. *Asahi Metal*, 480 US at 105-06. No majority of the Court could agree on whether minimum contacts had been established. *Id.* at 105. The Court

---

status; the second alleges a state of mind. Neither comprises an act constituting a "contact" for purposes of jurisdiction under ORCP 4 L.

then turned to the reasonableness of asserting jurisdiction, considering (1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Asahi Metal*, 480 US at 113-14. In light of those factors, eight members of the Court concluded that exercising personal jurisdiction over the Japanese corporation would be unreasonable:

> "Certainly the burden on the defendant in this case is severe. Asahi has been commanded * * * not only to traverse the distance between Asahi's headquarters in Japan and the Superior Court of California * * *, but also to submit its dispute with Cheng Shin to a foreign nation's judicial system. The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.

> "When minimum contacts have been established often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Id*. at 114.

However, the Court noted that the transaction on which the indemnity claim was based took place in Taiwan and that Cheng Shin had not demonstrated that it was more convenient for it to litigate in California rather than Taiwan or Japan. *Id*. Similarly, the Court concluded that the interest of the forum state—California—was slight. *Id*. at 116. Although the California Supreme Court had couched the state's interest in terms of enforcing safety standards, the Supreme Court observed that the dispute was "primarily about indemnification rather than safety standards." *Id*. at 114-15. The Court was unsure whether California principles of indemnification should play a role in the dispute between foreign companies. *Id*. at 115. The Court then turned to consideration of the interests of "the several states":

> "In the present case, this * * * calls for a court to consider the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction by the California court. The procedural and substantive

interests of other nations in a state court's assertion of jurisdiction over an alien defendant will differ from case to case. In every case, however, those interests, as well as the federal interest in its foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum state. 'Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.' " *Id.* (emphasis in original) (quoting *United States v. First National City Bank*, 379 US 378, 404, 85 S Ct 528, 13 L Ed 2d 365 (1965) (Harlan, J., dissenting)).

Having weighed the factors, the Court concluded that, "[c]onsidering the international context, the heavy burden on the alien defendant, and the slight interests of the plaintiff and the forum State, the exercise of personal jurisdiction by a California Court over Asahi in this instance would be unreasonable and unfair." *Id.* at 116.

The record before the trial court on Yasufuku's motion to dismiss for lack of personal jurisdiction consisted of the pleadings and the evidence, including affidavits, that the parties presented. ORCP 21 A; *Industrial Leasing Corp. v. Miami Ice Machine Co.*, 126 Or App 80, 83-84, 867 P2d 548 (1994). In his fraudulent conveyance claim, plaintiff sought, in part, to void the encumbrance on the Oregon Golf Club created by the granting of the trust deed to Yasufuku. According to plaintiff's claim, the transfer was effected for the purpose of defrauding creditors, including plaintiff. Plaintiff sought to void the transfer "to the extent necessary to satisfy [his] claims," that is, to the extent necessary for Ebisu to repay its alleged $8 million debt to him.

In his affidavit in opposition to the motion, plaintiff averred that the Oregon Golf Club had been sold and that Yasufuku had "divided the sale of Daioh Oregon assets, including the Oregon Golf Club, with Daioh Japan." Consistent with that averment, plaintiff produced no evidence that Yasufuku's trust deed constituted a current encumbrance on any Oregon real property or that he was entitled, by reason of Ebisu's asserted debt, to an interest in any such property

itself. In addition, although he asserted an interest in the proceeds from the sale of the property, plaintiff produced no evidence that Yasufuku held any proceeds in Oregon. Thus, at the time Yasufuku's motion was decided, the question before the court was whether it was reasonable for it to assert jurisdiction over a Japanese defendant for the purpose of resolving a dispute between that defendant and a Japanese plaintiff regarding property—albeit proceeds of a sale of Oregon real property—whose location was not shown to be in Oregon.

Applying the above-described *Asahi Metal* factors to those facts, we conclude that an exercise of jurisdiction over Yasufuku in Oregon under those circumstances would be unreasonable. First, as in *Asahi Metal*, the burden on Yasufuku, a Japanese citizen, would be substantial, not only in geographical distance but also, and more significantly, in submission to a foreign legal system. Second, where the dispute concerned only the proper disposition as between two Japanese citizens of monetary assets not apparently held in Oregon, Oregon's interest in resolution of the dispute is slight. Third, plaintiff has failed to demonstrate any substantial interest in obtaining relief in Oregon; nor have we identified any reason why this dispute would be more conveniently or appropriately litigated here rather than in Japan. Fourth, and for the same reasons, it appears that the dispute would be most efficiently resolved in Japan, where evidence relating to the various underlying transactions—in addition to the sale proceeds themselves—is most likely to be found.

Finally, "the interest of the several states" does not weigh in favor of Oregon exercising jurisdiction. As in *Asahi Metal*, we must consider the "procedural and substantive policies of other *nations* whose interests are affected by the assertions of jurisdiction." 480 US at 115 (emphasis in original). Also as in *Asahi Metal*, the interest of Japan here is best served by our "unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum state." *Id*. The dispute between plaintiff and Yasufuku has touched Oregon, but its origins and practical effects are rooted in Japan. Accordingly, we conclude that an exercise of personal jurisdiction over Yasufuku in Oregon is unreasonable, and the trial court

erred[11] in denying Yasufuku's motion to dismiss on that ground.[12]

**13.** Next, plaintiff assigns error to the trial court's order directing a verdict on his claims against Daioh Oregon, Ebisu, Majima, and Nakai related to the Akashi building.[13] The trial court did not specify the grounds on which it granted a directed verdict. Ebisu, against whom the breach of contract, fraud, and civil conspiracy claims are in part alleged, cross-assigns error to the trial court's denial of its motion to dismiss for lack of personal jurisdiction. Again, because a judgment is void if the trial court lacks personal jurisdiction, *Hermens*, 117 Or App at 319, we begin with Ebisu's personal jurisdiction argument.

As noted above, plaintiff has the burden of alleging and proving facts sufficient to establish personal jurisdiction. *Portland Trailer*, 166 Or App at 654. We review the determination of personal jurisdiction for errors of law. *Id.* Plaintiff argues that the evidence established a web of connections among Ohno, Ebisu, and both Daioh companies that would permit a reasonable factfinder to conclude that Ohno was acting as Ebisu's agent when he arranged plaintiff's $8 million loan. Ebisu responds by pointing to the pretrial affidavit of its Japanese attorney stating that under Japanese law, "a regular director is not an agent for the corporation, is not authorized to act as an agent of the corporation, and is not empowered to conduct business on the corporation's behalf."

Plaintiff does not contend that Ebisu had contacts with Oregon other than through Ohno, in his role as its agent, in arranging the loan. Instead, plaintiff relies on *Vuylsteke v. Broan*, 172 Or App 74, 83, 17 P3d 1072 (2001), for the proposition that, because the affidavit was not offered at trial, we may not consider it on appeal from a *directed verdict* in favor of Ebisu based on lack of personal jurisdiction.

---

[11] The trial judge was not the judge who ruled on pretrial motions to dismiss for lack of jurisdiction.

[12] Because the trial court's granting of summary judgment and a directed verdict in Yasufuku's favor had the effect of dismissing plaintiff's claims against Yasufuku, we affirm the trial court, albeit on other grounds.

[13] Again, plaintiff asserted five claims relating to what he asserted was an $8 million dollar loan, secured by the Akashi building, to Ebisu: claims for breach of contract, fraud, breach of agency duties, breach of fiduciary duty, and civil conspiracy and aiding and abetting.

However, plaintiff ignores the fact that Ebisu *cross-assigned* error to the trial court's denial of its *motion to dismiss* for lack of personal jurisdiction. Because the supporting affidavit was submitted with that motion, we may consider the affidavit in addressing the issue of personal jurisdiction over Ebisu. *Id.* at 80; *see also* ORCP 21 A.

 Here, the success of plaintiff's three claims against Ebisu is predicated on Ohno having acted as Ebisu's agent. Plaintiff does not specify the type of agency alleged here or the evidence relevant to it. There are two types of agency that plaintiff may seek to establish to support his claim against Ebisu: actual agency and apparent agency. To establish actual agency, plaintiff was required to offer evidence of (1) the manifestation of consent by Ebisu to Ohno that Ohno would act on its behalf and subject to its control, and (2) consent by Ohno so to act. *Rough & Ready Lumber v. Blue Sky Forest Products*, 105 Or App 227, 231, 804 P2d 498 (1991) (quoting *Restatement (Second) of Agency* § 1 (1958)). Thus, actual agency is based on a delegation of actual authority. The only evidence before the trial court when it ruled on Ebisu's motion to dismiss for lack of personal jurisdiction was the affidavit of Ebisu's Japanese attorney. Again, the affidavit stated that, although Ohno had been on the board of directors for Ebisu, Ohno had not been empowered to act as Ebisu's agent. Plaintiff offered no competent evidence to rebut the affidavit.[14] Therefore, the only evidence before the trial court was that Ohno had no actual authority to act as Ebisu's agent.

 In the absence of agency based on actual authority, plaintiff was required to produce evidence of apparent agency to support personal jurisdiction over Ebisu. *Miller v. McDonald's Corp.*, 150 Or App 274, 282, 945 P2d 1107 (1997).[15] To establish apparent agency, plaintiff must have

---

[14] In response, plaintiff submitted an unsworn, written statement that "Ohno led me to believe that he was acting on his own behalf and as representative of his corporations—Daioh Japan, Daioh Oregon, and Ebisu—with regard to the loan and its repayment." However, an unsworn statement is not competent evidence in Oregon courts for establishing jurisdictional facts. *See White v. Mac Air Corp.*, 147 Or App 714, 718, 938 P2d 241, *rev den* 326 Or 59 (1997). Accordingly, we do not consider the statement.

[15] Although courts sometimes have used "apparent authority" and "apparent agency" interchangeably, the distinction is important. "Apparent agency creates an agency relationship that does not otherwise exist, while apparent authority

offered evidence that (1) Ebisu held out Ohno as an agent, and (2) plaintiff justifiably relied on that holding out. *See id.* at 282-83. Plaintiff alleged neither such "holding out" by Ebisu nor reliance on plaintiff's part. The only evidence of "holding out" came from the affidavit submitted by Ebisu, which acknowledged that Ohno was a director of the corporation. However, no evidence before the trial court established that plaintiff relied on that information in agreeing to the transaction. Accordingly, there was insufficient evidence before the trial court to support an exercise of personal jurisdiction over Ebisu, and the trial court erred in denying Ebisu's motion to dismiss on that ground.[16]

 We turn to plaintiff's claims regarding the Akashi building as asserted in whole or in part against defendants Daioh Oregon, Majima, and Nakai (collectively, defendants).[17] Plaintiff first challenges the trial court's conclusion that he did not offer evidence sufficient to establish the existence and terms of the oral contract for plaintiff's loan purportedly secured by the Akashi building. A directed verdict based on insufficiency of the evidence "is appropriate only if there is a complete absence of proof of an essential issue." *Day v. City of Canby*, 143 Or App 341, 345, 922 P2d 1269 (1996), *rev den* 324 Or 654 (1997). Therefore, we review the record for *any* evidence that would allow a reasonable factfinder to conclude otherwise. *Id.*

 Plaintiff contends that his testimony, combined with documentary evidence of monthly payments he received from Ebisu and Daioh Japan, established the existence of the loan. As to its terms, plaintiff argues that the amount of the loan was established by the sale price reflected in documents relating to the Akashi building. Plaintiff contends that the

expands the authority of an actual agent." *Miller*, 150 Or App at 282 n 4. Thus, apparent authority is relevant only if actual agency already has been established. Here, because plaintiff has offered no evidence to establish the *existence* of an actual agency, apparent authority is not implicated.

[16] Because we conclude that the trial court lacked personal jurisdiction over Ebisu, we need not reach Ebisu's other arguments, and we affirm the trial court's judgment regarding Ebisu, albeit on other grounds.

[17] Because none of the remaining defendants—Daioh Oregon, Nakai, and Majima—appeared on appeal, we consider only plaintiff's arguments. ORAP 5.60.

loan's 6 percent interest rate and date of principal repayment—on the sale of the residential lots surrounding the Oregon Golf Club—were established by his testimony. Viewed in the light most favorable to plaintiff, the described evidence would be sufficient to establish the existence of a loan. To the extent that its decision rested on insufficiency of the evidence, the trial court erred in concluding otherwise.

However, the trial court alternatively predicated its decision to dismiss on principles of comity, although the trial court did not explicitly use the term. *See Jacobs v. Tristar Industries*, 74 Or App 31, 36, 701 P2d 455 (1985).[18] In granting defendants' motions for directed verdict, the court said:

> "First, the motion for directed verdict on all claims relating to the Akashi building. Those would be claims number 6(2), 7, 9, 10, 11, and 12, as I understand plaintiff's first amended complaint.
>
> "It is the court's opinion that there is insufficient proof of a loan. Documents show that [plaintiff] bought the building. The court is of the opinion that he cannot say in Japan that he bought a building, claiming the tax benefits and so forth in Japan, and then come here and claim otherwise.
>
> "There really is no evidence that is in the record that the loan transaction had any real contact with the state of Oregon, and it is the court's opinion that all the circumstances surrounding this alleged loan and purchase of the Akashi building are matters for the Japanese courts rather than Oregon courts. So I will dismiss all of those claims."

Plaintiff asserts that defendants' arguments to the trial court related to comity were too vague to justify dismissing the claims against them. He contends that the arguments more properly related to the issues of lack of personal jurisdiction, ORCP 4, the existence of another action pending, ORCP 21 A(3), and inconvenient forum. We disagree.

---

[18] Although defendants do not appear on appeal, we note that no issues of subject matter jurisdiction were raised at trial, and we perceive none that requires our attention *sua sponte*. Because we are faced with no jurisdictional issues, we turn to the doctrine of comity. *See North Pacific Ins. Co. v. Switzler*, 143 Or App 223, 237 n 14, 924 P2d 839 (1996) (declining to reach comity arguments where jurisdiction was dispositive).

"Comity is a flexible concept that counsels us to enforce the laws of other states when, in the circumstances at hand, those laws neither offend international duty or convenience nor fail to protect the recognized rights of our citizens." *Novich v. McClean*, 172 Or App 241, 245, 18 P3d 424 (2001). In *Jacobs*, we quoted *Hilton v. Guyot*, 159 US 113, 16 S Ct 139, 40 L Ed 95 (1895), in which the Supreme Court further defined "comity":

> " 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Jacobs*, 74 Or App at 36 (quoting *Hilton*, 159 US at 163-64).

A court's invocation of comity in declining to consider an issue is a matter of discretion, which we review for abuse of discretion. *Fry v. D. H. Overmyer Co., Inc.*, 269 Or 281, 290, 525 P2d 140 (1974). Relevant considerations include convenience, *id.*, the strength of the claim's ties to each forum, *see Goode and Goode*, 165 Or App 327, 336-37, 997 P2d 244, *rev den* 330 Or 412 (2000) (considering forum connections in dissolution action), and the relative expertise of courts in each forum, *see Kerr v. Miller*, 159 Or App 613, 636, 977 P2d 438, *rev den* 329 Or 287 (1999) ("Because the substance of Kerr's attack * * * depends on principles of bankruptcy law, we decline, as did the trial court, to revisit the bankruptcy court's ruling."). Comity incorporates facts *relevant* to personal jurisdiction, but it amounts to a discretionary determination that the court will decline to exercise its power *despite* the existence of personal jurisdiction. Similarly, the relative convenience of the courts of different nations plays a part in the comity determination, but the fact that the inconvenient forum doctrine might be applicable in a particular case does not preclude application of the doctrine of comity to that same case.

In terms of convenience, plaintiff, defendants, and all witnesses associated with the transaction reside in Japan, which also is the site of the Akashi building itself. In addition, plaintiff's only documentary evidence of the amount of the loan comes from a contract negotiated in Japan, based on Japanese law, and memorialized in the Japanese language. Moreover, with its motion to dismiss, Ebisu submitted a copy of a complaint filed by plaintiff in Japan's courts seeking money owed under that contract. The complaint in Japan characterized the contract as being *"for the purchase and sale"* of the Akashi building. We need not decide whether plaintiff's statement is accurate or binding; we note only that Japan's courts are in the best position to determine the true character of the transaction. Finally, we note that, in the trial court, defendants targeted their comity arguments entirely at the Akashi building transaction. By contrast, defendants did not argue that comity precluded the trial court from addressing plaintiff's claims under ORICO, which revolved around acts in Oregon. Although the trial court may have had discretion to reach a different conclusion, under comity principles, regarding its consideration of plaintiff's Akashi building claims, it was not required to do so. In the described circumstances, we cannot say that the trial court abused its discretion in granting defendants' motion for a directed verdict on the basis of comity.

■ Lastly, plaintiff assigns error to the trial court's granting of defendants' directed verdict motion on his ORICO claims. In granting defendants' motion, the trial court explained:

> "There's insufficient evidence of a tangible enterprise that was engaged in racketeering. * * * [T]he enterprise here is too amorphous in the court's opinion, and in any event, there wasn't sufficient evidence to show that that enterprise, if it existed, was engaged in racketeering.
>
> "There's no proof that any of these defendants * * * participated in the operation or management of the enterprise. That is to say that none of them had any authority to direct or control the enterprise nor participate in directing such an enterprise.

"Also, in my opinion there's not sufficient proof of any sufficient predicate acts to support the racketeering claim. I think the argument about wire fraud and mail fraud and so forth is pretty farfetched.

"[The v]arious degrees of theft under the Oregon statutes that are claimed to have been violated also [are] not persuasive. What we have in this case is apparently a civil fraud. There really is no criminal activity. I doubt seriously whether any prosecutor would think about filing criminal charges on [the] kind of evidence that's been presented in this case."

We review the directed verdict for errors of law, considering the evidence in the light most favorable to plaintiff, the non-moving party. *Checkley v. Boyd*, 170 Or App 721, 738, 14 P3d 81 (2000).

 Plaintiff alleged claims under each of the four subsections of ORS 166.720.[19] However, plaintiff did not distinguish among the four subsections of ORS 166.720 for purposes of his various specifications of damages. Plaintiff alleged:

---

[19] ORS 166.720 provides, in part:

"(1) It is unlawful for any person who has knowingly received any proceeds derived, directly or indirectly, from a pattern of racketeering activity or through the collection of an unlawful debt to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest or equity in, real property or in the establishment or operation of any enterprise.

"(2) It is unlawful for any person, through a pattern of racketeering activity or through the collection of an unlawful debt, to acquire or maintain, directly or indirectly, any interest in or control of any real property or enterprise.

"(3) It is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt.

"(4) It is unlawful for any person to conspire or endeavor to violate any of the provisions of subsections (1), (2) or (3) of this section."

ORS 166.715(6) defines "racketeering activity" as "to commit, to attempt to commit, [or] to conspire to commit" conduct constituting a listed crime. ORS 166.715(4) defines "pattern of racketeering activity" as

"engaging in at least two incidents of racketeering activity that have the same or similar intents, results, accomplices, victims or methods of commission or otherwise are interrelated by distinguishing characteristics, including a nexus to the same enterprise, and are not isolated incidents, provided at least one of such incidents occurred after November 1, 1981, and that the last of such incidents occurred within five years after a prior incident of racketeering activity."

"50.

"As a direct and proximate result of the unlawful racketeering activities * * * [plaintiff was] injured and sustained actual damages on the Durham Building purchase in an amount not less than $627,000 * * *.

"51.

"As a direct and proximate result of the unlawful racketeering activities * * * [plaintiff was] injured and sustained actual damages in relation to the $8 million loan in an amount not less than $8 million * * *.

"52.

"As a direct and proximate result of the unlawful racketeering activities * * * [plaintiff was] injured and sustained actual damages in an amount not less than $209,545 * * *."

To prove a claim under ORS 166.720(1), plaintiff must produce evidence that he was injured *by the use or investment* of racketeering income, as opposed to injury caused *by the predicate acts themselves. Beckett v. Computer Career Institute, Inc.,* 120 Or App 143, 147, 852 P2d 840 (1993). Similarly, under ORS 166.720(2), plaintiff must show that he was injured *by the acquisition* of an interest in a legitimate business enterprise, and, under ORS 166.720(4), *by the conspiracy itself. See id.* Here, plaintiff has not alleged any injury apart from that caused by the predicate acts themselves. Plaintiff demurs that a chain of causation suffices to establish injury, stating that "the use of fraudulently obtained money from [plaintiff] was used to keep the enterprise afloat, which allowed the enterprise to continue to feed at the fraudulent trough, thereby resulting in the entire monetary losses suffered by [plaintiff]." However, "[t]he connection between a defendant's use or investment of racketeering income and a plaintiff's injury must be more immediate [than mere reinvestment in the enterprise], such as the injury to [a] defendant's competitors." *Id.* at 147. Accordingly, the trial court did not err in granting a directed verdict on plaintiff's claims under ORS 166.720(1), (2), and (4).

■ By contrast, "ORS 166.720(3) is the avenue to redress injuries caused by the predicate acts themselves." *Kilminster v. Day Management Corp.*, 133 Or App 159, 169, 890 P2d 1004 (1995), *aff'd on other grounds* 323 Or 618, 919 P2d 474 (1996). The essential elements of subsection (3) consist of: (1) a defendant's direct or indirect participation (2) in a pattern of racketeering activity (3) as part of an enterprise.

■ An "enterprise" includes "any individual, sole proprietorship, partnership, corporation, business trust or other profit or nonprofit legal entity, and includes any union, association or group of individuals associated in fact although not a legal entity, and both illicit and licit enterprises and governmental and nongovernmental entities." ORS 166.715(2). Plaintiff produced evidence that the Daioh companies were controlled by Ohno and employed both Nakai and Majima. Because plaintiff's evidence established that defendants were associated in fact, it sufficed to show that defendants participated in an enterprise.

A pattern of racketeering activity requires at least two predicate acts, related by their "intents, results, accomplices, victims or methods of commission or otherwise * * * interrelated by distinguishing characteristics, including a nexus to the same enterprise[.]" ORS 166.715(4). As noted above, predicate acts include "any conduct that constitutes" certain listed crimes. ORS 166.715(6)(a). Plaintiff argues that he produced evidence of federal wire and/or mail fraud, 18 USC §§ 1341, 1343, in addition to theft by deception, ORS 164.085, theft by receiving, ORS 164.095, the fraudulent obtaining of a signature, ORS 165.042, falsification of business records, ORS 165.080(1), and misapplication of entrusted funds, ORS 165.095. Plaintiff notes that, if established, all predicate acts were related in that they shared the same victim—plaintiff. As we now explain, viewed in the light most favorable to plaintiff, the evidence established a *prima facie* case against at least one defendant as to all but two alleged predicate acts.

To establish mail fraud, plaintiff must offer evidence that each defendant (1) formed a scheme to defraud, (2) used the U.S. Postal Service in furtherance of the scheme, and (3) did so with the specific intent to deceive or defraud. 18

USC § 1341; *Taylor v. Hender*, 116 Or App 142, 146, 840 P2d 1331 (1992). Wire fraud differs from mail fraud only in the mechanism used; plaintiff must establish that each defendant used wire transmission in furtherance of the scheme. 18 USC § 1343.

■ We begin with defendants' actions associated with the Durham & Bates transaction. As to all defendants, testimony establishing the sale to plaintiff mere hours after Daioh Oregon completed its purchase at a lower price is sufficient to establish a specific intent to defraud.[20] Nakai testified that he knew about the price differential at the time but did not disclose it to plaintiff. Nakai also testified that he was an employee of Daioh Oregon, so his knowledge provides *prima facie* evidence that Daioh Oregon also knew of the price differential and did not disclose it. As to Majima, the chain of evidence, although marginally longer, also is sufficient: Plaintiff testified that Majima worked in concert with Ohno on the transaction, and Nakai testified that Majima answered to Ohno and sent faxes to him. Accordingly, plaintiff produced *prima facie* evidence that each defendant had a specific intent to defraud. Not surprisingly, the same evidence establishes the *existence* of a scheme to defraud.

■ ■ As to the use of the postal service or wire transmission, that evidence also varies with each defendant. Plaintiff's Exhibit 8, a letter from Daioh Oregon offering $1.5 million to the sellers of the Durham & Bates building, establishes Daioh Oregon's use of the U.S. Postal Service. Plaintiff's Exhibit 7, a faxed copy of the letter, establishes its use of a wire transmission. Accordingly, plaintiff established a *prima facie* case of mail fraud and wire fraud against Daioh Oregon. As to Nakai, Sekiguchi testified in his deposition that "from time to time [Nakai] did talk to [Ohno] on the phone and he did send some facsimile to Japan, Daioh Japan, regarding Durham & Bates," but plaintiff does not point to any evidence that Nakai used the U.S. Postal Service. Similarly, plaintiff testified that Majima had presented to him the fax listing the Durham & Bates property at $2 million, but plaintiff points to no evidence that Majima used the U.S.

---

[20] Because we review only for *prima facie* evidence, we need recount here only a sample of the evidence tending to establish each element.

Postal Service. Based on the described evidence, plaintiff established a *prima facie* case of wire fraud against Nakai and Majima, but plaintiff failed to establish mail fraud.

■ Plaintiff contends that the Durham & Bates transaction also provided evidence of theft by deception, theft by receiving, and fraudulently obtaining a signature. The elements of theft by deception are: (1) obtaining property of another (2) by using any of five deceptive mechanisms (3) with an intent to defraud. ORS 164.085(1).[21] The prohibited mechanisms include: creating or confirming another's false impression of value that the actor does not believe to be true, failing to correct such an impression previously created, and promising performance that the actor does not intend to perform. *Id.* In this case, Nakai's testimony that he knew about the price differential at the time the Durham & Bates building transaction occurred and did not disclose it to plaintiff establishes all elements as to both him and Daioh Oregon. Similarly, Nakai's testimony that Majima was aware of the price differential and did not disclose it establishes all elements against Majima. Finally, plaintiff's testimony established that Majima and Nakai entered the Durham & Bates transaction as representatives of plaintiff's agents, the Daioh companies. An agent has a duty to protect the economic interests of the principal. *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 161, 843 P2d 890 (1992). Because the evidence showed that defendants promised to act as plaintiff's agents but did not protect his economic interests, plaintiff established *prima facie* evidence that defendants committed theft by deception under ORS 164.085(1) (a), (b), and (e).

■ Next, the elements of theft by receiving are: (1) receipt, retention, concealment, or disposal of property of

---

[21] ORS 164.085(1) provides, in part:

"A person, who obtains property of another thereby, commits theft by deception when, with intent to defraud, the person:

"(a) Creates or confirms another's false impression of law, value, intention or other state of mind which the actor does not believe to be true; or

"(b) Fails to correct a false impression which the person previously created or confirmed; or

"* * * * *

"(e) Promises performance which the person does not intend to perform or knows will not be performed."

another (2) that the actor knows or has good reason to know was the subject of theft. ORS 164.095.[22] Again, Nakai testified that all three defendants knew of the price differential at the time of the sale to plaintiff. That testimony constitutes *prima facie* evidence that defendants had good reason to know that $325,000 of plaintiff's purchase funds were the subject of theft by deception. Testimony that defendants assumed control of the $325,000 at closing amounts to *prima facie* evidence of receipt. *See* ORS 164.095(2) (defining "receiving" as "acquiring possession, control or title, or lending on the security of the property"). Accordingly, plaintiff has established a *prima facie* case of theft by receiving against each defendant.[23]

■ The elements of fraudulently obtaining a signature are: (1) obtaining a written signature (2) by knowingly misrepresenting a fact (3) with intent to defraud. ORS 165.042(1).[24] Again, Nakai's testimony that he and Majima were aware of the price discrepancy and did not disclose it to plaintiff at closing is *prima facie* evidence of defendants' knowing misrepresentation of the price and intent to defraud. Testimony that plaintiff did, in fact, purchase the Durham & Bates building provides *prima facie* evidence that he provided a signature to defendants. Therefore, plaintiff

---

[22] ORS 164.095 provides:

"(1) A person commits theft by receiving if the person receives, retains, conceals or disposes of property of another knowing or having good reason to know that the property was the subject of theft.

"(2) 'Receiving' means acquiring possession, control or title, or lending on the security of the property."

[23] ORS 164.025 provides that conduct denominated as theft under ORS 164.015, which refers to various theft offenses, including theft by deception (ORS 164.085) and theft by receiving (ORS 164.095), "constitutes a single offense." However, this court held in *State v. Watts*, 60 Or App 217, 222, 653 P2d 560 (1982), *rev den* 294 Or 536 (1983), that "[ORS 164.025] is procedural; it does not establish, as a matter of substantive criminal law, that theft by taking and theft by deception constitute a single criminal act." Because we are reviewing only for *prima facie* evidence of each offense, and because plaintiff established *prima facie* evidence of at least one additional predicate offense as to each defendant, we need not determine whether the two types of theft alleged in each transaction would constitute a single predicate offense in these circumstances for purposes of ORICO.

[24] ORS 165.042(1) provides that "[a] person commits the crime of fraudulently obtaining a signature if, with intent to defraud or injure another, he obtains the signature of a person to a written instrument by knowingly misrepresenting any fact."

has established a *prima facie* case of fraudulently obtaining a signature against all three defendants.

■■ ■■ Plaintiff contends that he offered *prima facie* evidence of the same five crimes with regard to the Ridge Condos transaction. We agree in part. As to mail and wire fraud, plaintiff testified that Majima and Nakai told plaintiff that the price charged to plaintiff was a good one. Combined with plaintiff's Exhibit 182—a fax from Nakai to Ohno's wife that confirmed Daioh Oregon's profit on the Ridge Condos transactions—the testimony provides *prima facie* evidence of intent and a scheme to defraud as to all defendants. Plaintiff's Exhibit 87—a letter confirming to a Chicago escrow company that Nakai would have authority to act on behalf of Daioh Oregon to sell the Ridge Condos to plaintiff—provides *prima facie* evidence of use of the mail for Nakai and Daioh Oregon. Exhibits 158 and 159—fax records of Daioh Oregon's $900,000 purchase of Ridge Condos and its subsequent $1,109,545 sale to plaintiff—establish Nakai's and Daioh Oregon's use of wire services. However, plaintiff identifies no evidence establishing that Majima used either U.S. mail or wire services in relation to the Ridge Condos transaction.

■■ As to theft by deception, plaintiff's Exhibit 76 reflects that Nakai himself signed purchase documents for the Ridge Condos for the price of $900,000. Plaintiff testified that Majima and Nakai told plaintiff that the price charged to plaintiff—$1.1 million—was a good one. That testimony provides evidence that defendants' representation created a false impression of value. Further, no evidence suggests that any defendant ever attempted to correct the false impression, which amounts to *prima facie* evidence of a failure to correct the false impression. Finally, testimony established that Majima and Nakai entered the Ridge Condos transaction as representatives of plaintiff's agents, the Daioh companies. Again, agency includes a duty to protect the economic interests of the principal. *Onita Pacific*, 315 Or at 161. Thus, because testimony shows that defendants promised to act as plaintiff's agents but did not protect his economic interests, plaintiff has established *prima facie* evidence that defendants committed theft by deception under ORS 164.085(1)(a), (b), and (e).

■ As to theft by receiving, plaintiff's testimony that Nakai and Majima told him that the $1.1 million purchase price was a good one, that plaintiff subsequently purchased the Ridge Condos at that price, and that Daioh Oregon retained $200,000 of plaintiff's purchase funds provides *prima facie* evidence that defendants received, retained or disposed of plaintiff's purchase funds while having good reason to know that the $200,000 was the subject of theft by deception. Therefore, plaintiff has established a *prima facie* case against all defendants of theft by receiving.

■ As to fraudulently obtaining a signature, plaintiff's testimony that Nakai and Majima told him that $1.1 million was a good price provides *prima facie* evidence of defendants' knowing misrepresentation of the price and intent to defraud. Testimony that plaintiff did, in fact, purchase the Ridge Condos provides *prima facie* evidence that he provided a signature to defendants. Therefore, plaintiff again has established a *prima facie* case of fraudulently obtaining a signature against all three defendants.

■ Plaintiff also alleged two predicate acts as to which we conclude he failed to establish a *prima facie* case. First, plaintiff contends that he established falsification of business records in the course of the Durham & Bates transaction:

> "[B]oth Exhibit [145] (the proforma containing the false reference to a $2 million selling price) and Exhibit [4] (the falsified sales brochure with the falsified change in the reference sales price of the property) which Daioh Oregon had received and maintained in its business records constituted sufficient evidence for the crime * * *."

ORS 165.080(1) defines falsification of business records:

> "A person commits the crime of falsifying business records if, with intent to defraud, the person:
>
> "(a) Makes or causes a false entry in the *business records* of an enterprise; or
>
> "(b) Alters, erases, obliterates, deletes, removes or destroys a true entry in the *business records* of an enterprise; or
>
> "(c) Fails to make a true entry in the *business records* of an enterprise in violation of a known duty imposed upon

the person by law or by the nature of the position of the person; or

"(d) Prevents the making of a true entry or causes the omission thereof in the *business records* of an enterprise." (Emphasis added.)

ORS 165.075(2) defines business records as "any writing or article kept or maintained by an enterprise for the purpose of evidencing or reflecting *its* condition or activities." (Emphasis added.) Here, the brochure and proforma may reflect the condition or activities of the Durham & Bates building, but the copies at issue were not "kept" by the building's owners. Conversely, although the documents were "kept" by Daioh Oregon, they do not furnish evidence of *that entity's* condition or activities.[25] Thus, they are not business records for purposes of ORS 165.080(1), and plaintiff has not established a *prima facie* case of falsifying business records.

 Finally, plaintiff contends that he established misapplication of entrusted funds. Plaintiff argues that

"[a]s to the Durham & Bates and Ridge Condos schemes, there was sufficient evidence for the jury to find that the applicable Defendants were agents and/or fiduciaries of [plaintiff] and that they worked together to misapply entrusted funds by virtue of the fact that they caused [plaintiff] to entrust payment of money to Daioh Oregon far in excess of what they had led [plaintiff] to believe were the best sales prices. In addition, with respect to the Durham & Bates transaction, the applicable defendants actually arranged for [plaintiff] to entrust them with the money that Daioh Oregon used to buy the Durham & Bates Building in order to cheat [plaintiff]."

ORS 165.095(1) provides, in part:

"A person commits the crime of misapplication of entrusted property if, with knowledge that the misapplication is unlawful and that it involves a substantial risk of loss or detriment to the owner or beneficiary of such property, the person intentionally misapplies or disposes of

---

[25] To the extent that the price alteration itself might represent an "activity" of Daioh Oregon, the documents accurately reflect that alteration. Thus, the altered price would not reflect a "false entry."

property that has been entrusted to the person as a fiduciary * * *."

In order to establish a *prima facie* case that defendants committed that offense, plaintiff was required to establish that he entrusted funds to defendants for the purpose of their purchase of the Durham & Bates and Ridge Condos properties on his behalf and that defendants used *plaintiff's* funds for the purchases. Plaintiff points to no evidence establishing that fact, however. Rather, the record indicates that Daioh Oregon purchased the properties with its own funds and that plaintiff then purchased the properties from Daioh Oregon, albeit immediately and at a fraudulent price. Plaintiff failed to establish that Daioh Oregon, Nakai, or Majima misapplied funds "entrusted" to them by plaintiff.

Thus, with regard to the Durham & Bates transaction, plaintiff adduced *prima facie* evidence of conduct that constitutes wire fraud (Daioh Oregon, Nakai, and Majima) and mail fraud (Daioh Oregon), theft by deception (all three), theft by receiving (all three), and fraudulently obtaining a signature (all three). With regard to the Ridge Condos transaction, plaintiff produced *prima facie* evidence of mail fraud (Daioh Oregon and Nakai), wire fraud (Daioh Oregon and Nakai), theft by deception (all three), theft by receiving (all three), and fraudulently obtaining a signature (all three). Because plaintiff offered *prima facie* evidence of conduct that would constitute at least two predicate offenses by each defendant, as part of an enterprise, and against the same victim, we conclude that plaintiff presented sufficient evidence of predicate elements of an ORICO claim under ORS 166.720(3) in the respects described above. The trial court erred in directing a verdict in favor of defendants as to those claims.

In summary, we conclude that the trial court did not abuse its discretion in granting a directed verdict, on the basis of comity, as to plaintiff's claims relating to the Akashi building. However, the trial court erred as a matter of law in denying motions by Yasufuku and Ebisu to dismiss plaintiff's claims against them for lack of personal jurisdiction. Finally, the trial court erred in directing a verdict in favor of Daioh

Oregon, Majima, and Nakai on plaintiff's ORICO claims under ORS 166.720(3) in the respects noted.

Judgment dismissing ORICO claims under ORS 166.720(3) against Daioh Oregon, Nakai, and Majima reversed and remanded; otherwise affirmed.